DAVID R. JONES *et al.*

*v.*

PETER ROBERTSON.

*Filed at Mt. Vernon March 30, 1886.*

1. MINES AND MINING—*of contiguous mining property—as respects the flow of water from one mine into another of less elevation—relative rights and duties of the upper and lower proprietors.* In the case of coal mining properties contiguous to each other, and being worked by different proprietors, so situated that they are upon a descending grade, while each owner has the right to take out all the coal within the limits of his own boundaries,—that is, each may work to the dividing line in every direction,—yet common prudence and self-interest would say the owner of the lower mine, when danger from water is apprehended, should not work up to the dividing line between himself and an upper owner, but should leave a wall of coal within his own boundaries, of sufficient width and strength to protect his mine from the flow of water from the upper mine.

2. Where there is a mining district consisting of several connecting mines, situate upon a different plane or level as respects each other, so that water would naturally take its course from the upper mine down through those below, if the upper proprietor finds himself threatened with an accumulation of water beyond him, as in the case of some old mines which had been worked and subsequently abandoned, such as will endanger the proper working of his mine, he may abandon his mine entirely, and let the water take its natural course; but he owes no such duty to the proprietors below as will require him to do so.

3. The upper proprietor so situated, if he can not adequately protect himself by the usual mode of pumping or lifting the water which comes into his mine, in barrels, to the surface, may erect a dam on his own premises to confine the accumulating water, in order that he may continue to work his mine.

Nor will the fact that the next lower proprietor has taken no precautionary measures to protect himself against the contingency of the giving way of the dam, and the accumulated water being precipitated into his mine to his injury, take away this right, the only condition being that the upper proprietor, in the erection of his dam, shall exercise ordinary care and skill, and with the limitation that the dam shall not have the effect to collect water from adjacent territory and eventually cast it upon a lower mine, which but for such dam would not have reached it at all.

4. So in an action brought by the owner of a coal mine to recover damages against an upper and adjacent proprietor, occasioned by the flooding of the plaintiff's mine, as the result of the giving way of a dam erected by the defendant in his mine, and thereby precipitating into the plaintiff's mine a large body of water which had accumulated behind the dam, it is not enough, in order to entitle the plaintiff to recover, that there be shown the building of the dam by the defendant, the accumulation of water behind it, and its subsequent giving way and flooding the plaintiff's mine.

5. In the same case it appeared the defendant, two years after the construction of the dam, leased his mine to others, who took immediate possession of the same, and continued in possession up to the time the dam gave way, some two years after the leasing. When built, the dam fully answered the purposes for which it was constructed, and so continued long after the defendant had leased the mine, successfully resisting the pressure of the accumulating water for about four years. The construction of the dam in the first instance was justified by the circumstances then existing. Under the facts there could be no liability on the part of defendant, except upon the theory that the construction of the dam at the outset was *per se* a nuisance, which is not the law, the building of it being a lawful act.

WRIT OF ERROR to the Appellate Court for the Fourth District;—heard in that court on writ of error to the Circuit Court of Madison county; the Hon. WILLIAM H. SNYDER, Judge, presiding.

Messrs. BAKER & BAKER, and Mr. JOHN F. McGINNIS, for the plaintiffs in error:

The percolation and flow of subterranean waters are governed by the same rules as the flow of surface streams, provided such subterranean streams are known. If not known, the owner of the dominant estate may, in digging for water, tap the stream which supplies the servient estate. *Brown* v. *Illinois*, 27 Conn. 84; *Johnston Cheese Co.* v. *Vight*, 69 N. Y.

16; *Chase* v. *Silverstone,* 62 Me. 175; *Taylor* v. *Welch,* 6 Oreg. 198; *Haldiman* v. *Bruckhart,* 45 Pa. 514.

A party has no right, by a dam or other artificial means, to obstruct the natural flow of surface water, to the injury of his neighbor, and if he does, he is liable in damages. *Hill* v. *Ward,* 2 Gilm. 285; *Budd* v. *Williams,* 43 Ill. 385; *Brown* v. *Bowman,* 30 N. Y. 519; *Great Fall Co.* v. *Worster,* 15 N. H. 412; *Strout* v. *Millbridge Co.* 45 Me. 76; *Railroad Co.* v. *Morrison,* 71 Ill. 616; *Railroad Co.* v. *Moffitt,* 75 id. 524; *Railroad Co.* v. *Cox,* 91 id. 500; *Bell* v. *McClintock,* 9 Watts, 119; *Gilham* v. *Railroad Co.* 49 Ill. 484; *Casebur* v. *Mowry,* 55 Pa. St. 419.

An action equally lies whether the effect of the dam is to discharge a superabundance of water below him, or set it back upon his neighbor above him. 6 Wait's Actions and Defences, 274, sec. 15; *Merritt* v. *Brinkerhoff,* 17 Johns. 306; *Tillotson* v. *Smith,* 32 N. H. 90; *Davis* v. *Getchell,* 50 Me. 602; *Gerish* v. *Manufacturing Co.* 30 N. H. 478.

One who collects and stores water on his land is liable for its escape and injury, to another, however careful he may have been. Moak's Underhill on Torts, 353; *Fletcher* v. *Ryland,* L. R. 3 H. L. 330; *Smith* v. *Fletcher,* L. R. 9 Ex. 64; 8 Eng. 510. See, also, *Pottel* v. *Long,* 56 N. Y. 200; *Inhabitants* v. *Smith,* 12 Cush. 177; *Inhabitants* v. *Walker,* 100 Mass. 94; *Nichols* v. *Marshland,* L. R. 10 Ex. 255; *Crommelieu* v. *Cox,* 30 Ala. 518.

The owner of a lower field has no right to erect embankments whereby the natural flow of water from the upper field shall be stopped, nor has the owner of the upper field a right to make any excavation or drain by which the flow of water from the upper field is diverted from its natural channel and a new channel is made on the lower ground; nor can he collect into one channel flowing off into his neighbor's land by several channels, and thus increase the rush upon the lower fields. 6 Wait's Actions and Defences, 264; *Latimer* v. *Davis,*

14 La. Ann. 161; *Bowman* v. *New Orleans*, 27 id. 501; *Martin* v. *Riddell*, 26 Pa. St. 415; *Ogburn* v. *Conner*, 46 Cal. 546; *Porter* v. *Durham*, 74 N. C. 767; *Butler* v. *Peck*, 6 Ohio St. 344.

A person who, for his own use, brings upon his land, and collects and keeps there, anything likely to do mischief if it escapes, such as water, is *prima facie* liable for all damage which is the natural consequence of its escape, though guilty of no negligence. 1 Addison on Torts, secs. 91, 95.

This liability of one erecting a nuisance continues, although he may have leased the premises to another who continues it. *Grady* v. *Walsmer*, 46 Ala. 381; *Plumer* v. *Harper*, 3 N. H. 88; *Railroad Co.* v. *Mihlanan*, 17 Kas. 224; *Staple* v. *Spring*, 10 Mass. 72; *Swords* v. *Edgar*, 59 N. Y. 28; *Waggoner* v. *Jermaine*, 3 Denio, 306; 1 Addison on Torts, sec. 222; *Stephani* v. *Brown*, 40 Ill. 428.

Although the owner of a mine on a higher level than an adjoining mine, has a right to work the whole mine in the usual and proper manner, and is not liable for any water which may flow by gravitation into an adjoining mine from works so constructed, still he has no right to be an active agent in sending water into the lower mine. *Baird* v. *Williamson*, 15 C. B. (N. S.) 376; *Tillotson* v. *Smith*, 32 N. H. 90.

It is a reasonable and just rule that the owner of a mine upon a higher level must use proper diligence to prevent the flow of water from his mine into the lower one. *Coal Co.* v. *Ganell*, 9 Phil. 247.

Mr. George F. McNulty, and Messrs. Wise & Davis, for the defendant in error:

The verdict being in accordance with the weight of evidence, settles the facts as contended for by the plaintiffs, and this court will not disturb the verdict.

Plaintiffs were trespassers, worked over bounds, and took out coal from defendant's mine, connecting their mine with defendant's mine. Where they thus connected the mines the

water ran in, which destroyed their mine. They can not complain of the result of their own wrongful act.

Water is a common enemy, which each mine owner must fight as best he can to protect his property. Bainbridge on Mines, sec. 3, chap. 10, p. 394.

The building of the dam was proper mining. Being so, defendant is not responsible, except for willfulness or gross carelessness in erecting or maintaining it; and not then if the same damage would have resulted to the plaintiffs if the dam had not been built and the water allowed to run. *Clark* v. *Willett,* 35 Cal. 534; *Tenney* v. *Ditch Co.* 7 id. 335; *Everett* v. *Tunnel Co.* 23 id. 225.

The mine of plaintiffs being on a lower level than that of defendant, they should have left a barrier on their line, to protect their mine from water coming from the adjoining higher mine or from any old mines with which it might be connected. *Smith* v. *Kenrick,* 7 Com. 515; *Baird* v. *Williamson,* 15 Com. (N. S.) 376; Leading Cases of Mines and Minerals, 629; *McKnight* v. *Ratcliffe,* 44 Pa. St. 156.

Mr. CHIEF JUSTICE MULKEY delivered the opinion of the Court:

On the 15th day of June, 1881, the plaintiffs in error brought an *action on the case,* in the Madison circuit court, against the defendant in error, for an alleged injury to certain coal mines belonging to the plaintiffs. There was a trial before the court and a jury, upon issues of fact, resulting in a verdict and judgment for the defendant, which was subsequently affirmed by the Appellate Court for the Fourth District. Counsel for plaintiffs make no complaint in the argument filed, of the rulings of the circuit court upon questions of evidence, but ask a reversal solely on the ground the jury were not properly instructed on the trial, as to the law of the case.

The record discloses substantially the following state of facts: The plaintiffs and defendant, before and at the time

of the alleged injury, were engaged in mining coal from their respective lands, which lie contiguous to each other, and their several parcels constituted a part of a large body of coal lands lying near North Alton, belonging to various coal operators, and known as the "coal branch." The lot of land belonging to the plaintiffs contains twenty acres, and lies in the extreme north-east corner of the coal branch, and is bounded on the south by the defendant's land. The tract of the defendant contains seventy-eight and one-half acres, and in part lies immediately south of the plaintiffs' tract, but being much wider than theirs, it extends considerably farther west. The coal branch mines all "dip" from the south-west to the north-east, so that upon the removal of the coal from any of them, the water accumulating therein would, if unobstructed, naturally flow into the plaintiffs' mines. Prior to the injury complained of, the plaintiffs had sunk two shafts on their land,—one about the centre, and the other near the dividing line between them and the defendant. The two mines of the plaintiffs were, as seems to have been the custom, connected, so as to afford a passage from one mine to the other. Most of the coal properly belonging to the south mine had been removed before the present controversy arose. In drifting south, the plaintiffs, presumably by mistake, had crossed the line between them and the defendant at the north-east corner of the land of the latter, and had removed the coal for a distance of some ninety-five feet, by means of which mine No. 1 of plaintiffs, and No. 7 of the defendant, were connected. Mine No. 7 was also connected with another mine of the defendant, a short distance in a south-west direction from the latter, known as mine No. 6. Those two mines were originally dry, and were both worked at the same time. In drifting west in No. 6, the defendant broke into No. 5, an old abandoned mine of his. West and north-west of No. 5 is an extensive area of territory, consisting of old, abandoned mines belonging to various parties, all of which, in process of mining, had become connected, so that

the water in most of them, which had been accumulating for years, was constantly pressing down and forcing its way towards the mines of the plaintiffs and the defendant; yet its progress was arrested at mine No. 5 of the defendant, so long as that remained unconnected with the mines below it. When, however, No. 5 became connected with No. 6, as heretofore stated, the water at once commenced making its way through No. 5 into No. 6, and so continued until about a year afterwards, when the defendant found himself unable to control the water which was rapidly forcing its way into No. 6.

The usual method which prevailed at the coal branch of getting rid of water in the mines, was to collect it in a sump or basin excavated near the mouth of the pit, and hoist it to the top of the shaft in barrels. When, however, the accumulations became so great that the water could not be disposed of in that way, except at a cost that would not pay to take out the coal, it was the custom or usage, under such circumstances, for the owner of the mine to protect himself from the aggressions of the water as best he could, by the erection of a dam or other like means. Thus, Walton Rutledge, a surveyor and mining engineer, and one of plaintiffs' own witnesses, testifies: "It is customary to make a dam whenever necessary. The rule all work by, is for each person to protect his own mine against water." The defendant being no longer able to control the water in No. 6, as above stated, was forced to abandon it. But with a view of preventing the water, which he could no longer control, from forcing its way into No. 7, and driving him out of that also, he determined to build a strong dam between No. 6 and No. 7, so as to confine the water in No. 6, which he accordingly did, and thereupon abandoned No. 6 altogether. Had this not been done, it is clear the water would have not only destroyed the defendant's remaining mine, No. 7, but would have passed on through that into the plaintiffs', and thus have destroyed all of them long before the alleged injury occurred, unless the

plaintiffs' had adopted similar measures for their own protection, by building a like dam between their own mines. Some four years after the building of the dam by the defendant, during which time it protected, as we have just seen, the plaintiffs' and defendant's mines alike, it finally, by reason of the constantly increasing pressure, gave way, when the long pent up waters poured down through mine No. 7 of the defendant, into the mines of the plaintiffs, overflowing and submerging them in water. The plaintiffs in the present action seek to recover from the defendant damages alleged to have resulted from the breaking of the dam, and the consequent flooding of their mines.

It further appears that some two years before the breaking of the dam, to-wit, on the 25th of March, 1874, the defendant leased his entire mines for a period of ten years, commencing on that day and ending on the 25th of March, 1884, to Thomas Hamilton and Thomas Cunningham, who at once took possession and control of the mines under their lease, and so continued in possession and control of the same up to the time of the breaking of the dam. That the dam, when built, was sufficiently strong and properly constructed, is not only settled by the finding of the Appellate Court, but is conclusively shown by the fact that it effectually withstood the constantly increasing pressure of the accumulating waters for some two years after the leasing of the mines, making about four years altogether from the time it was built.

Under this state of facts the plaintiffs asked the court to give the jury the following instruction, which the court refused to do, and the plaintiffs excepted:

"If the jury believe, from the evidence, that there was a dam erected in one of the main leads or ways of the coal mine of the defendant, either by the defendant, or his lessee, by and with his knowledge and consent, and that by reason of such dam being erected the natural and ordinary flow of the water percolating and flowing through said mine was checked, and

thereby accumulated in the mine of said defendant in a large and unusual quantity back of and behind said dam, whereby said dam broke and gave away, and precipitated with an irresistible force a large and unusual quantity of water in and upon the mine of the plaintiffs, and drowned out and destroyed the same, then the jury must find for the plaintffs."

We agree with counsel for plaintiffs in error that this instruction fairly presents the legal theory upon which the plaintiffs must recover, if they can recover at all. On the other hand, if the instruction can not be sustained on legal principles, the judgment is proper, and should not be disturbed, even conceding some of the instructions for the defendant in error are not technically accurate.

It was contended by the plaintiffs, on the trial below, that the defendant was guilty of negligence in operating his mines in such a manner as to connect them with the old abandoned mines lying west and north-west of his own, by means of which, as we have seen, the amount of water flowing into mine No. 6 was so increased as to become uncontrollable by the ordinary method of collecting it in a sump, and hoisting it in barrels to the top of the shaft. It was also contended that notwithstanding this increase of water, the defendant, by the exercise of reasonable care and diligence, might have hoisted it to the top of the mine in the manner stated, and that hence there was no necessity for building the dam. It was further contended that the dam was not made sufficiently strong at the outset, and that there was also negligence in not keeping it in repair. There was, moreover, a sharp conflict in the evidence as to what was the custom or usage at the mines respecting these matters, and also as to whether the defendant had conformed to such usage or custom. The refused instruction, however, ignores all these issues of fact which were submitted to the jury, and declares, as matter of law, that in order to entitle the plaintiffs to recover it is only necessary for them to show the building of the dam by the

defendant, the accumulation of water behind it, and its subsequently giving away and flooding the plaintiffs' mines. If such be the law, much labor and time might have been saved by excluding all evidence offered on those issues, with the exception just stated.

We are clearly of opinion the instruction in question was properly refused. The reasons which lead to this conclusion may be stated very briefly.

The case in hand, modified somewhat by special circumstances, is, in most of its essential features, like many others to be found in the books. It is a controversy between owners of adjacent mines, where, as is usually the case, the mine of the defendant is upon a higher plane than that of the plaintiffs, and the complaint is, that waters improperly pent up in the defendant's mine have escaped and flooded that of the plaintiffs. The question then arises, what are the mutual rights and duties of the owners of adjacent mines thus situated? The answer to this question will present the general view which we entertain of the law as applicable to this case, and the one which we think is fully sustained by the authorities. We understand that each owner of mines thus situated has the right to take out *all the coal* within the limits of his own boundaries,—that is, each may work to the dividing line in every direction, but of course can not cross it without becoming a trespasser. While this is so, common prudence and self-interest would say the owner of the lower mine, when danger from water is apprehended, as is generally the case, should not work up to the dividing line between himself and the upper owner, but should leave a wall of coal within his own boundaries, of sufficient width and strength to protect him from the encroachments of the water from the upper mine, which, if unobstructed, would necessarily flow into his own. Where there is a mining district consisting of numerous connecting mines, and those at the upper part of the dip, or on the higher level, have been mined and abandoned, it is

clear the waters gathering and percolating through them will, by force of the law of gravitation, be thrown in a body upon the first mine below which is being worked, in which case, if the owner is not able to protect himself from the water thus concentrated, by the ordinary methods of pumping or hoisting it to the top of the shaft in barrels, it is manifest he must either abandon the mine altogether, or resort to some other more efficacious means to prevent a loss of his property. Such is exactly the case here.

The question then arises, what duties does the owner of the mine having this increased burden and peril cast upon it, owe to the proprietor of the one immediately below him, where such proprietor has failed to take any precautionary steps for his own protection, as was the case here. If the upper proprietor is unable to profitably work his mine without building a dam across the way leading into it from above, may he do so?—or must he abandon his own mine altogether rather than incur the risk of the dam ultimately giving way and precipitating the water thus accumulated in undue quantities, upon himself and the owner below, before the latter has been able to take out all of his coal? Under the circumstances stated, we do not understand the law requires the owner of the upper mine to so abandon his property in order to avoid such a contingency as that suggested. On the contrary, we are of opinion he has the right to build the dam, and if in doing so he exercises ordinary care and skill, he will not be held liable for the consequences should it subsequently give way without his fault. While it is customary for the owners of mines to keep them as free from water as practicable, yet they are not bound by law to do so. The only obligation resting upon them in such respect, is that of self-interest. The upper owner may abandon his own mine whenever he pleases, notwithstanding his doing so may largely increase the flow of water into the mine below, and thereby greatly enhance the labor and expense of the owner in oper-

ating it. So the owner of a mine, for the purpose of protecting himself from the encroachments of water, which is regarded as the "common enemy" of mines and mining interests, may erect a dam or any other structure on his own premises, if necessary for such purpose, subject to the limitation that such dam or other structure does not have the effect to collect water from adjacent territory, and eventually cast it upon a lower mine, which but for such dam or other structure would not have reached it.

There is another consideration which, in our judgment, forbids a recovery in this case. Two years before the breaking of the dam, as has already been seen, the defendant leased the mines to others, who took immediate possession of the same, and continued in possession up to the time the dam gave way, and there is not the slightest ground for the claim that the defendant is liable for the consequences of the dam's ultimate failure, unless the position assumed by the refused instruction can be maintained, namely, that its construction at the outset was *per se* a nuisance, which we are satisfied, as already indicated, is not the law. We hold the building of the dam was a lawful act, clearly justified by the circumstances under which it was built. When built it fully answered the purpose for which it was constructed, and so continued long after the defendant had leased the mines. It successfully resisted the constantly increasing pressure, resulting from the daily accumulation of the water, for about four years, protecting the mines of the plaintiffs and defendant alike. The general view here taken is fully sustained by the following authorities: Gould on Waters, 294; Bainbridge on Mines, (1st Am. ed. from 3d Gould's ed.) 394; *Alton* v. *Blundell,* 12 M. & W. 324; *Smith* v. *Kenrick,* 7 Com. B. 515; *Baird et al.* v. *Williamson et al.* 15 id. 375; *Everett et al.* v. *Hydraulic Flume and Tunnel Co.* 23 Cal. 225; Leading Cases on Mines and Mining, 629.

The judgment will be affirmed.      *Judgment affirmed.*